**BANKERS TRUST NEW YORK COR-PORATION and Consolidated Subsidiaries, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–186T.

United States Court of Federal Claims.

June 26, 1996.

Joel V. Williamson, Chicago, Illinois, for plaintiff. Thomas C. Durham, (argued), and Kim Marie Boylan, of counsel.

G. Robson Stewart, Washington, D.C., for defendant. Assistant Attorney General Loretta C. Argrett, and Chief Mildred L. Seidman, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on the parties' cross motions for partial summary judgment pursuant to RCFC 56. At issue is whether plaintiff, Bankers Trust, is entitled to foreign tax credits under § 901 of the Internal Revenue Code, for taxes paid to the government

of Brazil, where the Brazilian government paid a subsidy to Brazilian borrowers for a portion of the taxes paid. The court heard oral argument on March 14, 1996. For the reasons set forth below, the court holds that plaintiff is not entitled to the foreign tax credits; accordingly, the court grants defendant's motion and denies plaintiff's motion.

## FACTS

The parties filed their cross motions with a Joint Stipulation of Facts. There are no genuine issues of material fact. During the 1980 tax year, Bankers Trust made several loans, called "net loans," to Brazilian borrowers. A net loan is a loan in which the lender and the borrower agree, by contract, that all payments of principal and interest made directly to the lender be made net of Brazilian taxes. The Brazilian borrower agreed to pay Bankers Trust the amount of interest stated in the loan contract, after the reduction for Brazilian income tax due on the interest income. With a net loan, any risk or benefit from a change in the Brazilian tax rate falls to the borrower because the lender's return is specified, by contract, net of tax. *See Continental Ill. Corp. v. Commissioner*, 998 F.2d 513, 519 (7th Cir.1993), *cert. denied*, 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994).

Foreign lenders such as Bankers Trust were required to pay 25 percent Brazilian income tax on all interest income from these loans. Brazilian law provides that interest cannot be paid to the foreign lender until proof is provided that any Brazilian income tax due has been paid. The Brazilian borrower is required by law to withhold the Brazilian tax from the interest payment before paying the American lender. The borrower then remits the withheld tax to the Brazilian government, and pays the interest to the lender. Although the borrower remits the tax to the Brazilian government, and although the loans at issue are net of tax, Bankers Trust is the party legally liable for the tax.

As an incentive to encourage foreign loans to Brazil, Brazilian law provided for a "pecuniary benefit," or subsidy, to Brazilian borrowers of foreign loans. According to the

pecuniary benefit rules, the Brazilian borrower would receive a subsidy equivalent to a percentage of the stated income tax on the interest on these foreign loans. To obtain the pecuniary benefit, the Brazilian borrower was required to remit the Brazilian income taxes to the Brazilian government through an authorized intermediary commercial bank. The borrower received the pecuniary benefit by means of a credit to the borrower's current account with a commercial bank through which the income tax was paid. For example, assuming a ten dollar tax liability on a particular transaction and an 85 percent pecuniary benefit, the borrower withholds the ten dollars from its interest payment to Bankers Trust and pays the ten dollars to the Brazilian government through the intermediary bank. Thereafter, in a wholly separate transaction, the Brazilian government provides a pecuniary benefit to the borrower in the amount of $8.50 ($10 × 85%). Essentially, the Brazilian government rebates to the borrower 85 percent of the Brazilian income tax paid. Economically speaking, the pecuniary benefit reduces the Brazilian borrower's cost of borrowing foreign funds.

To afford smaller Brazilian borrowers the same advantages of these foreign loans and the accompanying pecuniary benefit, Brazil allowed large Brazilian banks to borrow from foreign lenders, such as Bankers Trust, and re-lend the funds to third parties throughout Brazil. These particular net loans are called "repass loans" and the third-party borrowers, "repass borrowers." The American lenders had no relationship with the repass borrowers and generally were not aware of their identity. However, the repassing bank was obligated to transfer the proportionate value of the pecuniary benefit to the repass borrower on the day the bank received the credit. The transfer of the pecuniary benefit from the Brazilian bank to the repass borrower had the purpose of reducing the cost of the repass loan incurred by the repass borrower in order to encourage borrowing using foreign lenders. Bankers Trust made loans directly to Brazilian borrowers and also to Brazilian banks (repass lenders), which in turn made repass loans to repass borrowers.

Bankers Trust filed a consolidated corporate income tax return for the taxable year ending December 31, 1980. While conducting an audit, the Internal Revenue Service ("IRS") made adjustments to income, credits, and deductions affecting Bankers Trust's tax liability for 1980. During the audit, Bankers Trust claimed additional foreign tax credits, not claimed on the initial return, for the total stated amount of income tax which Brazilian law imposes on interest remitted by Brazilian borrowers to foreign lenders in accordance with the loan contract. The IRS disallowed that portion of Bankers Trust's foreign tax credit which corresponded to the stated amount of income tax credited by the Brazilian government to the Brazilian borrowers under the pecuniary benefit provisions; that is, the IRS disallowed the amount of tax the Brazilian government refunded to the borrower. Bankers Trust timely filed a claim for a refund for the amounts attributable to the pecuniary benefit, which the IRS denied. On March 17, 1992, Bankers Trust timely filed a complaint in this court, seeking, *inter alia*, a refund for the claimed foreign tax credit based on the Brazilian pecuniary benefit disallowed by the IRS.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56(c). In evaluating a motion for summary judgment, any doubt as to whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court does not "weigh the evidence and determine the truth of the matter but [only] determine[s] whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510–11. When the moving party has carried its burden, the non-moving party must come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-moving party may not discharge its burden by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978); *Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975).

When the parties have filed cross motions for summary judgment, as in this case, the court must evaluate each party's motion on its own merits. The court's duty to decide whether summary judgment is appropriate is not abrogated by the fact that both parties argue in favor of summary judgment and allege that there are no genuine issues of material fact for trial. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Bataco Indus., Inc. v. United States*, 29 Fed.Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed.Cir.1994). Cross motions are simply a claim by each party that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not establish that if one is rejected the other must necessarily be allowed. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco*, 29 Fed. Cl. at 322.

### II. Foreign Tax Credits

Under the Internal Revenue Code for 1980, a domestic corporation could claim a credit against its federal income tax liability for "the amount of any income ... taxes paid or accrued during the taxable year to any foreign country...." 26 U.S.C. § 901(b)(1) (1976 & Supp. IV 1980). The purpose of the foreign tax credit is to guard against double taxation of foreign income. *See United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 139, 110 S.Ct. 462, 467, 107 L.Ed.2d 449 (1989); *American Chicle Co. v. United States*, 316 U.S. 450, 451, 62 S.Ct. 1144, 1144, 86 L.Ed. 1591 (1942). During 1980, the applicable tax year, a Temporary Treasury Regulation (no longer in force) disallowed a

foreign tax credit for amounts "used directly or indirectly by the [foreign] country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer." Temp.Treas.Reg. § 4.901–2(f)(3)(i)(A). The regulation defines "indirect subsidy" as follows:

> (ii) *Indirect subsidies.* A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that—
>
> . . . . .
>
> (B) Engages in a business transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.

*Id.* § 4.901–2(f)(3)(ii). This temporary regulation has since been codified with little change in wording. *See* 26 U.S.C. § 901(i) (1994).

▬▬▬ Substantial deference is afforded to the Commissioner's interpretation of treasury regulations. *Jewett v. Commissioner,* 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982). Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *Commissioner v. South Tex. Lumber Co.,* 333 U.S 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948)); *Dow Corning Corp. v. United States,* 984 F.2d 416, 419 (Fed.Cir.1993). This court will afford temporary regulations the same deference as permanent regulations.[1] *See Zinniel v. Commissioner,* 89 T.C. 357, 369, 1987 WL 43894 (1987), *aff'd,* 883 F.2d 1350 (7th Cir. 1989), *cert. denied,* 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990) (discussing a proposed regulation: "If respondent wanted these sections of the regulations to carry more weight than a position advanced on brief, he could have issued them as temporary regulations."). To decide whether a treasury regulation is reasonable, courts should determine "whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose." *National Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979).

After a careful review of the temporary regulation and section 901 of the Internal Revenue Code, the court finds that this regulation must be sustained because it is reasonable and consistent with the revenue statute. *See Portland Cement,* 450 U.S. at 169, 101 S.Ct. at 1045; *South Texas,* 333 U.S. at 501, 68 S.Ct. at 698. The plain language of the temporary regulation clearly and unambiguously deprives plaintiff of any foreign tax credit for monies rebated to Brazilian borrowers under the pecuniary benefit program. This disallowance has the obvious effect of preventing a taxpayer from receiving a foreign tax credit for a tax which in effect was not paid. The statutory language "paid or accrued . . . to any foreign country" is reasonably harmonious with the temporary regulation, which considers the payment of the Brazilian tax and receipt of the pecuniary benefit together to determine the amount of any allowable foreign tax credit.

Both the Seventh and Eighth Circuit Courts of Appeals have held that this same Temporary Treasury Regulation is reasonable and consistent with the Congressional intent of section 901, as both the regulation and statute apply to the Brazilian pecuniary benefit program. *Norwest Corp. v. Commissioner,* 69 F.3d 1404, 1409–10 (8th Cir.1995), *cert. denied,* ——— U.S. ———, 116 S.Ct. 1704, 134 L.Ed.2d 802 (1996); *Continental Ill. Corp. v. Commissioner,* 998 F.2d 513, 519–20 (7th Cir.1993), *cert. denied,* 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994). Moreover, the interplay between section 901 and the temporary regulation is consistent with the Supreme Court's stated purpose of the foreign tax credit to reduce double taxation of foreign income. Bankers Trust "is not subject to double taxation because the pecuniary benefit or subsidy was not paid to the Brazilian government. This is because

---

**1.** Neither party has sought to distinguish temporary treasury regulations from permanent treasury regulations and the court finds no such distinction.

the pecuniary benefit or subsidy operated as a rebate of most of the local tax, in effect reducing the tax rate by 80%, from 25% to 5%." *Norwest*, 69 F.3d at 1409; *see Continental*, 998 F.2d at 519.

Bankers Trust argues that the foreign tax credit should not be reduced by the subsidy paid to Brazilian borrowers because plaintiff received no economic benefit from the subsidy. Stretching this argument even further, plaintiff claims that the regulation would be invalid if it were interpreted to exclude an economic benefit analysis. The crux of plaintiff's economic benefit theory stems from its faulty interpretation of temporary regulation 4.901–2(f)(3)(i)(A), as disallowing a foreign tax credit only when the amount of the pecuniary benefit is used "indirectly ... to provide a subsidy ... to the taxpayer." According to plaintiff's interpretation of the regulation, because a subsidy was not paid "to the taxpayer" indirectly, Bankers Trust received no economic benefit, and thus, no subsidy. Plaintiff argues that a taxpayer has received an indirect subsidy only in situations where the taxpayer may "capture" the benefit of the subsidy. Under plaintiff's theory, the Brazilian borrower is the party who benefits from the subsidies involved in this case, not Bankers Trust.

Although plaintiff places a great deal of weight on its economic benefit theory, the regulations say nothing as to the need for the taxpayer to receive or "capture" any such benefit. In fact, which party receives the economic benefit of the regulation is irrelevant under the temporary regulations. *Norwest*, 69 F.3d at 1409. Thus, even if Bankers Trust receives no economic benefit from the subsidies and the Brazilian borrowers receive all of the benefit, as plaintiff suggests, the payments still constitute an indirect subsidy which precludes Bankers Trust from receiving a foreign tax credit. Indeed, while discussing this same economic benefit argument, the Seventh Circuit stated that "[t]he regulation is clear as a bell, and its validity cannot seriously be questioned...." *Continental*, 998 F.2d at 520.

> The IRS regulation ... elides a difficult factual inquiry [into the extent of the taxpayer's economic benefit] by deeming the

taxpayer subsidized if the [foreign] country subsidizes a person with whom the taxpayer "engages in a business transaction," provided the subsidy "is determined directly or indirectly by reference to the amount of income tax ... imposed by the country on [that] person with respect to such transaction." ... [The IRS] must be given leeway in deciding when a rebate to a foreign business partner of a U.S. taxpayer should be deemed a subsidy to the taxpayer, disentitling [it] to a foreign tax credit.

*Norwest*, 69 F.3d at 1409–10 (quoting *Continental*, 998 F.2d at 520) (all but penultimate brackets in original).

The plain language of the temporary regulation and its clear fit with the circumstances of this case demonstrate that the party who receives the economic benefit of the subsidy is irrelevant:

> (3) *Subsidies*—(i) *General rule.* An amount is not income tax paid or accrued to [Brazil] to the extent that—
>
> (A) The amount is used ... indirectly by [Brazil] to provide a subsidy by any means ... to [Bankers Trust];
>
> . . . . .
>
> (ii) *Indirect subsidies.* [Brazil] is considered to provide a subsidy to [Bankers Trust] if [Brazil] provides a subsidy to [Brazilian borrowers] that—
>
> . . . . .
>
> (B) Engage[ ] in a business transaction with [Bankers Trust]....

*See* Temp.Treas.Reg. § 4.901–2(f)(3). Accordingly, the court rejects plaintiff's economic benefit argument.

Plaintiff further argues that since 1957, when the IRS first addressed the domestic tax consequences of foreign subsidies, the IRS's interpretation of section 901 has changed, and that it has, in the past, espoused the very argument that it now seeks to discredit. Bankers Trust points to private letter rulings, revenue rulings, and positions taken in litigation to demonstrate the IRS's alleged changes in position over the years. Plaintiff emphasizes a favorable private letter ruling issued to Bankers Trust stating that

the subsidies paid under the pecuniary benefit program were indeed creditable. PLR 7611239900A (Nov. 22, 1976). However, there was a caveat to the favorable ruling reflecting a possible reconsideration by the IRS. Despite the efforts of Bankers Trust and other American banks, the IRS revoked the favorable ruling by issuing the temporary regulations under section 901 discussed above.

The Supreme Court has held that "it is well established that the Commissioner may change an earlier interpretation of the law...." *Dickman v. Commissioner,* 465 U.S. 330, 343, 104 S.Ct. 1086, 1093, 79 L.Ed.2d 343 (1984). The *Dickman* Court held that the Commissioner's change in a long-standing policy dealing with the assessing of gift taxes was permissible. In another case, the Federal Circuit has also acknowledged the IRS's prerogative to change its interpretation of the Internal Revenue Code. *Fogarty v. United States,* 780 F.2d 1005, 1011 (Fed.Cir.1986). In *Fogarty,* the IRS changed its policy of treating members of religious orders *ipso facto* as agents of their orders, to one of inquiring into the facts of each case. This change had the effect of taxing Father Fogarty's income from a source not directly related to his duties as a Jesuit Priest. The Federal Circuit held that this change in administrative practice was permitted under the rationale of *Dickman. Id.; cf. Minnesota Power & Light Co. v. United States,* 782 F.2d 167, 173 (Fed.Cir. 1986) (alleged change in Commissioner's position in applying certain terms of highway use tax fell within Supreme Court's guidelines on the IRS changing its interpretation). This court holds that the IRS's alleged change in position on the issue of subsidies falls within the Commissioner's prerogative as outlined by the Supreme Court in *Dickman.* Not only is the Commissioner permitted to change interpretations of statutes, but in this particular case, the IRS put Bankers Trust on notice that a position change was indeed a possibility. *See Norwest,* 69 F.3d at 1410.

■ Bankers Trust also argues that if the court finds that it is not entitled to a foreign tax credit for subsidies paid on the direct, two-party loans, as the court finds in this decision, that the three-party or repass loans present additional legal issues which would entitle plaintiff to a credit for subsidies paid on those loans. Plaintiff claims that it did not engage "in a business transaction" with the repass borrowers. Indeed, the parties have stipulated that Bankers Trust had no relationship with repass borrowers, making the repass loan a separate transaction from the initial loan from Bankers Trust to the repass lender. However, when the repass lender made the interest payment to Bankers Trust, the repass lender received the subsidy, which it was required by Brazilian law to pass along to the repass borrowers. This court agrees with the Seventh and Eighth Circuits that repass loans fall "within the letter as well as the spirit of the subsidy regulation." *Continental,* 998 F.2d at 520; *Norwest,* 69 F.3d at 1410.

■ Plaintiff correctly points out that *Continental* and *Norwest* are not binding on this court. However, as the Federal Circuit stated, "[a]lthough decisions from other circuits are not binding on this court, we may look to another circuit for guidance and may be persuaded by its analysis." *Amerikohl Mining, Inc. v. United States,* 899 F.2d 1210, 1214 (Fed.Cir.1990).

### III. Mexican Railroad Car Rental Cases

■ This court's predecessor court, the Court of Claims, has held that a functionally similar subsidy scheme in Mexico did not deprive the American taxpayer of its foreign tax credits. The Mexican Subsidy Cases held that a Mexican withholding tax levied on freight car rentals was creditable, notwithstanding a subsidy Mexico granted to the Mexican companies renting the cars in an amount equal to the tax withheld. *Missouri Pac. R.R. v. United States,* 204 Ct.Cl. 837, 497 F.2d 1386 (1974); *Chicago, Burlington & Quincy R.R. v. United States,* 197 Ct.Cl. 264, 455 F.2d 993 (1972), *rev'd on other grounds,* 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973); *Missouri–Ill. R.R. v. United States,* 180 Ct.Cl. 1179, 381 F.2d 1001 (1967); *see also Missouri Pac. R.R. v. United States,* 301 F.Supp. 839 (E.D.Mo.1967), *aff'd in part, rev'd in part on other grounds,* 411 F.2d 327

(8th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970). All of these cases predated Temporary Treasury Regulation 4.901–2(f), which disallows the foreign tax credit in such cases.

In these cases, the Court of Claims held that the rental income received by the U.S. taxpayers was *"subject to the Mexican income tax law,"* and that the Mexican government had "clearly imposed a tax on income received by" an American taxpayer. *Chicago Burlington,* 197 Ct.Cl. at 310–11, 455 F.2d at 1020 (emphasis in original). The Mexican subsidy program did "not change the fact that the plaintiff made the payments," because the subsidy program was "wholly an internal Mexican affair that is of no concern to us." *Id.* at 315, 455 F.2d at 1023; *Missouri Pacific,* 204 Ct.Cl. at 853, 497 F.2d at 1395 ("That Mexico elected to appropriate the proceeds of the levies to the benefit of its domestic rail carriers does not mean that the sums involved were not collected from the plaintiff as a tax.").

 Bankers Trust argues that these cases are binding on this court and consequently, that it is entitled to a credit on the taxes for which Brazilian borrowers received subsidies. Defendant is correct in that decisions of the Court of Claims are binding on this court. *South Corp. v. United States,* 690 F.2d 1368, 1369 (Fed.Cir.1982) (*en banc*); United States Claims Court General Order No. 1, *reprinted in,* 1 Cl.Ct. at XXI (1982). The doctrine of *stare decisis* is certainly one of the fundamental building blocks of our nation's legal system. However, courts have recognized certain exceptions to *stare decisis* where a lower court need not follow the precedent of its superior courts. The Federal Circuit recently articulated one such exception. "This court applies the rule that earlier decisions prevail unless overruled by the court *en banc,* or by *other controlling authority* such as intervening statutory change or Supreme Court decision." *Texas Am. Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557, 1561 (Fed.Cir.1995)

(*en banc*) (emphasis added); *cf. Gould, Inc. v. United States,* 67 F.3d 925, 930 (Fed.Cir. 1995) (courts not bound by law of the case where "controlling authority has since made a contrary decision of the law applicable to the issues"); *Gindes v. United States,* 740 F.2d 947, 950 (Fed.Cir.), *cert. denied,* 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984) (same). This court is convinced that treasury regulations, including temporary regulations, fall into the "other controlling authority" category.[2]

 Treasury regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. Portland Cement Co.,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981) (quoting *Commissioner v. South Tex. Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948)). Treasury regulations "should not be overruled except for weighty reasons." *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Bingler v. Johnson,* 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969); *South Texas,* 333 U.S. at 501, 68 S.Ct. at 698. "Because Congress has delegated to the Commissioner the power to promulgate 'all needful rules and regulations for the enforcement of [the Internal Revenue Code],' 26 U.S.C. § 7805(a), we must defer to his regulatory interpretations of the Code so long as they are reasonable." *Cottage Sav. Ass'n v. Commissioner,* 499 U.S. 554, 560–61, 111 S.Ct. 1503, 1507–08, 113 L.Ed.2d 589 (1991); *Jewett v. Commissioner,* 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982) (substantial deference is afforded the Commissioner's interpretation of treasury regulations). The Federal Circuit has also emphasized its deference to treasury regulations and the Commissioner's interpretations: "... determinations of the Commissioner of Internal Revenue are presumptively correct, and the Commissioner's understanding of the statute, as expressed in properly enacted regulations, unless unreasonable, is virtually conclusive." *Lima Surgical Assocs., Inc. v. United States,* 944 F.2d 885, 888 (Fed.Cir.

2. Temporary Treasury Regulation 4.901–2(f) appears to have been tailored specifically to undermine the Brazilian pecuniary benefit program. To be sure, the IRS issued a revenue ruling, before the temporary regulations were released, specifically stating that "[t]he Service will not follow the Mexican railroad car rental court decisions...." Rev.Rul. 78–258, 1978–1 C.B. 239.

1991) (citations omitted); *see also Dow Corning Corp. v. United States,* 984 F.2d 416, 419 (Fed.Cir.1993) (citing a litany of Supreme Court precedent which underscores courts' deference to treasury regulations).

■ In addition to the strength of treasury regulations, the Federal Circuit has stressed the importance of maintaining a degree of uniformity among the circuits in tax cases. Because the Seventh and Eighth Circuits have held that the American taxpayer is not entitled to a foreign tax credit under the Brazilian subsidy program, maintaining consistency among the circuits is an important reason, although not mandatory, to hold against plaintiff in this case.

> We are, of course, not bound by [other Circuits'] ruling[s]. On the other hand, uniformity among the circuits is particularly desirable in tax cases to ensure equal application of the tax system to our citizenry. Thus, we are not inclined to reach a result in conflict with [other] Circuit[s] unless the statute or precedent of this court gives us, in our view, no alternative.

*Gibraltar Fin. Corp. v. United States,* 825 F.2d 1568, 1572 (Fed.Cir.1987) (footnote omitted). To hold differently in this case would be to undermine the uniform application of the tax system among the citizenry. This court holds that Temporary Treasury Regulation 4.901–2(f) gives the court no alternative but to not follow the Mexican Subsidy Cases.

### CONCLUSION

Based on the foregoing discussion, defendant's motion for partial summary judgment is allowed and plaintiff's cross motion is denied. The parties shall file a joint status report no later than July 22, 1996, proposing to the court how they wish to proceed in this case. No costs.

**IT IS SO ORDERED.**